IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| M.S., a minor, by and through her parent, J.S.,<br><br>     Plaintiff,<br><br>v.<br><br>UTAH SCHOOL FOR THE DEAF AND BLIND,<br><br>     Defendant. | MEMORANDUM DECISION AND ORDER ON CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD<br><br><br><br>Case No. 2:13-CV-420 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on cross-Motions for Judgment on the Administrative Record.[1]  For the reasons discussed below, the Court will grant in part and deny in part Plaintiff's Motion[2] and deny Defendant's Motion,[3] which requires the Court to affirm in part and reverse in part the Hearing Officer's May 10, 2013 Decision and Order.[4]

## I.  BACKGROUND

M.S. is a sixteen-year-old girl who is blind, is hearing impaired, and has been diagnosed with autism and a cognitive impairment.  M.S. is a residential student at the Utah School for the Deaf and Blind ("USDB").  M.S. has been a residential student at USDB since September 2004.  M.S. receives special education services at USDB where she is classified as having multiple disabilities.  M.S. makes slow progress and she is working on basic, functional, life-skills goals.

---

[1] Docket Nos. 25, 26.

[2] Docket No. 25.

[3] Docket No. 26.

[4] Docket No. 24, at 2–64 (Hearing Officer's May 10, 2013 Order).

USDB sent a letter home to M.S.'s mother in February 2010, noting that the school was closing its residential program and that M.S. would need to have her personal items packed no later than March 12, 2010. USDB's intention to restructure its residential program caused a strain in the relationship between USDB and M.S.'s mother. M.S.'s mother and other parents sought assistance from the Utah Parents of Blind Children to get assistance in keeping USDB's residential program open. Ultimately, USDB rescinded that letter and kept its residential program open.

In May 2010, Robert Shaw (audiologist at USDB) attempted to conduct an audiological evaluation on M.S. M.S. would not tolerate anything in or near her ears, so the audiological evaluation was unsuccessful. Several previous audiological tests on M.S. were also unsuccessful. A USDB audiologist in 2003 indicated that an auditory brainstem response ("ABR") test would "provide more definitive information about [M.S's] current level of hearing sensitivity."[5] After Mr. Shaw's unsuccessful audiological evaluation in May 2010, Mr. Shaw recommended an ABR test to get an objective evaluation of M.S.'s hearing.

An Individual Educational Program ("IEP") meeting for M.S. was held in August 2010 where M.S.'s mother indicated that she was dissatisfied with USDB's evaluation of M.S. and with M.S.'s slow progress toward her goals. M.S.'s mother requested an Independent Educational Evaluation ("IEE") by experts in the areas of autism and blindness. M.S.'s mother also requested a sedated ABR test be performed on M.S. to determine if M.S. had a hearing loss. USDB agreed to both requests. M.S.'s mother also requested that M.S's placement at USDB not be changed until the IEE was completed. USDB also agreed not to change M.S.'s placement

---

[5] *Id.* at 687.

until the IEE was performed. In February 2011, USDB's counsel sent M.S.'s mother a list of qualified evaluators for M.S.'s IEE. The letter also advised that USDB would allow a maximum of $2,000.00 for the IEE.

M.S. received the ABR test in September 2010, where it was discovered that she has a bilateral, mild to moderate, low frequency hearing loss that slopes to within normal limits at 2000 and 4000 hertz. After learning about M.S.'s hearing loss, M.S.'s classroom teacher at USDB, Ms. Hadley, introduced thirty tactile signs and noted that M.S. made progress in both receptively understanding the signs and in beginning to use the signs expressively. M.S.'s IEP was modified in May 2011 to add a frequency modulated system ("FM system") to her classroom so that amplification would help M.S. compensate for her hearing loss. Ms. Hadley, the teacher M.S. had for many years, left USDB in May 2011. M.S. began classes in August 2011 with a new teacher, Ms. Hollinger.

On September 13, 2011, another IEP meeting was held. At that meeting, M.S's parent advocate indicated that, because of the new diagnosis of a hearing impairment, M.S.'s mother was interested in receiving a deafblind IEE instead of an IEE for blindness and autism. USDB agreed that a deafblind IEE would cost more than the previously allotted $2,000.00 and that USDB would have to make more money available. The IEP that came out of the September 13, 2011 IEP meeting was not signed because it was still under construction. Various staff members at USDB were confused about whether the 2010–2011 IEP was to continue to be implemented or whether the 2011–2012 IEP should be implemented. Ms. Hollinger testified that she implemented both IEPs. However, Ms. Hollinger did not utilize tactile signs with M.S. She also did not utilize the FM system in the classroom during the entire 2011–2012 school year.

M.S.'s deafblind IEE was conducted at Perkins School for the Blind ("Perkins") in March 2012. USDB received the results of the IEE in May 2012. Among several other recommendations, the Perkins report recommended (1) an FM system for M.S., (2) a total communication approach to be used with her, (3) additional speech language services minutes, and (4) consistency for M.S. in all environments. USDB found many recommendations in the Perkins evaluation to be appropriate for M.S. USDB utilized the Perkins IEE for M.S.'s statutorily required three-year reevaluation.

M.S.'s next IEP meeting was held on October 29, 2012. At the IEP meeting USDB went over the Perkins IEE report. USDB was concerned with Perkins's disregard for M.S.'s autism diagnosis and Perkins's failure to appreciate M.S.'s usable hearing. M.S.'s mother was concerned that the autism diagnosis was conducted before M.S.'s hearing loss was diagnosed. Further, M.S.'s mother believed USDB discounted M.S.'s hearing loss. On December 17, 2012, M.S.'s next IEP meeting was held, this time with a facilitator present. The IEP meeting lasted over four hours but had to be cut short because M.S.'s mother had to go to work. USDB indicated that they would need to reconvene the meeting in order to finalize the IEP because several sections were not completed.

On January 8, 2013, M.S.'s mother filed for a due process hearing for alleged violations of the Individuals with Disabilities Educational Act ("IDEA" or "the Act"). Another IEP meeting was scheduled for February 4, 2013, where the December 17, 2012 IEP was finalized. This IEP changed M.S.'s placement to Provo School District ("PSD"). The due process hearing was held during the spring of 2013.

Five procedural issues and seven substantive issues were presented to the hearing officer for decision. The hearing officer found that USDB pre-determined extended-school-year services for M.S. outside of the context of an IEP meeting during 2011 and 2012 and that such was a procedural violation of the Act that denied M.S. a free and appropriate public education ("FAPE"). The hearing officer ordered compensatory education in the form of direct speech-language-pathology services. That issue is not being appealed.

The hearing officer also determined that PSD was not an appropriate placement for M.S. USDB appeals on that issue alone. The hearing officer found for USDB on all remaining substantive and procedural issues. M.S.'s mother appeals each of these issues. The Court will address each issue in turn.

## II. STANDARD OF REVIEW

Courts are to employ a unique standard of review in IDEA cases, one less deferential than that typically applied in review of administrative decisions.[6] In IDEA cases, courts apply a "modified de novo" standard under which they review the administrative record and base their decisions on the preponderance of the evidence.[7] In doing so, courts "must give 'due weight' to the hearing officer's findings of fact, which are considered *prima facie* correct."[8]

---

[6] *Thompson R2-J Sch. Dist. v. Jeff P. ex rel. Luke P.*, 540 F.3d 1143, 1149 (10th Cir. 2008).

[7] *Murray v. Montrose Cnty. Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir. 1995); *see also* 20 U.S.C. § 1415(i)(2)(C).

[8] *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004).

## III. DISCUSSION

"The IDEA provides federal funding to states to assist with the education of disabled children on the condition that states comply with the Act's 'extensive goals and procedures.'"[9] "One of the Act's stated purposes is 'to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'"[10]  The Act sets forth detailed procedures through which an IEP is to be developed.[11]  The IEP is a detailed written document that describes the student's educational goals for an academic year and establishes a plan to achieve those goals.[12]  The IEP is the "basic mechanism through which each child's individual goals are achieved."[13]  The IDEA contains both procedural requirements to ensure the proper development of an IEP and substantive requirements designed to ensure that each child receives a FAPE.[14]

### A.    PROCEDURAL ISSUES

Parents have a number of procedural rights under the IDEA.  Parents are entitled to

> (1) examine all records relating to their child, (2) participate in the IEP preparation process, (3) obtain an independent evaluation of their child, (4) receive notice before an amendment to an IEP is either proposed or refused, (5) take membership in any group that makes decisions about the educational

---

[9] *Jefferson Cnty. Sch. Dist. R-1 v. Elizabeth E. ex rel. Roxanne B.*, 702 F.3d 1227, 1229 (10th Cir. 2012) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)).

[10] *Id.* (quoting 20 U.S.C. § 1400(d)(1)(A)).

[11] *See* 20 U.S.C. § 1414(d).

[12] *Id.* § 1414(d)(1)(A)(i).

[13] *Murray*, 51 F.3d at 928.

[14] *See* 20 U.S.C. §§ 1414–15.

placement of their child, and (6) receive formal notice of their rights under the IDEA.[15] Proving a procedural violation is only a first step to obtaining relief.[16]  In order to be compensable, a procedural violation must either (1) impede the student's right to a FAPE, (2) significantly impede the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (3) cause a deprivation of educational benefit.[17]

1.    *Parent Participation*

The first issue before the Court is whether M.S.'s mother was denied meaningful participation during the IEP team meetings held in September 2011 and October and December 2012.  The hearing officer determined, and this Court concurs, that there was no procedural violation of the IDEA on this issue.  The Court has reviewed more than twenty hours of audio of M.S.'s IEP meetings from the dates at issue.  M.S.'s mother attended each of the IEP team meetings in question.  The school and parent worked collaboratively to schedule IEP meetings at a time convenient for the large IEP team.  In addition, the school scheduled the meetings at a time convenient for M.S.'s mother, her parent advocates, and for M.S.'s mother's interpreter.  The meetings addressed suggested revisions to the IEP, parent concerns, and M.S.'s progress

---

[15] *Ellenberg ex rel. S.E. v. N.M. Military Inst.*, 478 F.3d 1262, 1269 (10th Cir. 2007).

[16] *Systema ex rel. Systema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1313 (10th Cir. 2008).

[17] 34 C.F.R. § 300.513(a)(2); 20 U.S.C. § 1415(f)(3)(E)(ii). *Systema* applies the same standard with slightly different language choices.  *Systema* states that a procedural violation of the IDEA is compensable when the violation causes substantive harm to the student, deprives her of an IEP, or results in the loss of an educational opportunity.  *Systema*, 538 F.3d at 1313.

toward meeting her IEP goals.  Therefore, the Court finds no procedural violation as it relates to parent participation.

2. *2010–2011 IEP Revision of Service Minutes*

The next issue is whether USDB revised M.S.'s IEP on March 21, 2011, outside of an IEP team meeting in order to add service minutes to the IEP, and whether doing so denied M.S. a FAPE.  Service minutes are the amounts of time that M.S. receives related services from specialists in speech and language, orientation and mobility, occupational therapy, adaptive physical education, or other areas.

The record in this case shows that in response to a Utah State Office of Education onsite audit, Gloria Hearn (lead teacher at USDB who was a program specialist during the 2010–2011 school year) hand wrote service minutes on the 2010–2011 IEP, outside of an IEP Meeting, and provided M.S.'s mother with a copy of that revision.[18]  Such is a procedural violation of the IDEA.  Thus, the Court must consider whether this violation is compensable.

Although a technical deviation of the IDEA, writing in service minutes did not deny M.S. a FAPE.  The record reflects that Ms. Hearn wrote in service minutes that reflected service times that M.S. was already receiving.  There is no evidence in the record that adding in the service minutes that M.S. was already receiving to the IEP caused substantive harm to M.S., deprived M.S. of an IEP, or resulted in the loss of an educational opportunity.  Although M.S.'s mother desired additional service minutes for M.S., her available service minutes were not changed for the 2010–2011 year.  Plaintiff has failed to prove by a preponderance of the evidence that the

_____

[18] Docket No. 24, at 624–26.

addition of related service minutes to M.S.'s IEP denied M.S. a FAPE. Based on the above,

Plaintiff has not met her burden on this issue.

3.      *FM System*

The next procedural issue is whether USDB discontinued use of the FM system as an

accommodation for M.S. during the 2011–2012 school year, without the approval of the IEP

team and without prior written notice to the parent, and whether such procedural violation of the

IDEA denied M.S. a FAPE. The parties and the hearing officer identify the issue related to the

FM system as a procedural issue and therefore the Court does the same. However, this dispute

can also be described as a dispute over the implementation of the IEP. Regardless of whether

this issue is described as procedural or substantive, the analysis hinges on whether M.S. was

denied a FAPE.

Plaintiff argues that USDB's discontinued use of the FM system during the 2011–2012

year constitutes a procedural violation of the IDEA. The hearing officer maintained that the

weight of the evidence presented indicated only that an FM system may help M.S., not that it

was essential in order for M.S. to access her educational environment.[19] He then found no

violation because the IEP did not require full-time use of the FM system and because the FM

system remained installed in the classroom and was operational during the year.[20]

To comply with IDEA, schools must satisfy the procedural requirements of the Act and

provide an appropriate education "in conformity with" an IEP in order to provide a student with

_____

[19] *Id.* at 40.

[20] *Id.* at 18.

a FAPE.[21]  A FAPE is an "education that is specifically designed to meet the child's unique needs, supported by services that will permit [the student] 'to benefit' from the instruction."[22]

        *a.*      *Procedural Violation*

The following facts are relevant to the claim concerning the amplification system. Because of M.S.'s tactile sensitivity, audiologists were never able to perform a full hearing assessment on M.S.[23]  Mr. Shaw testified that an audiogram conducted by USDB in 2003 stated that "[f]our previous OAE screenings have been attempted but could not be completed due to patient movement and noise.  An auditory brainstem response (ABR) test may provide more definitive information about [MS's] current level of hearing sensitivity."[24]  An ABR is a test of how sound travels through the ear and brainstem[25] and is performed on infants and on people who are not able to give responses.[26]  An ABR test was not done until re-recommended by Mr. Shaw in 2010.[27]  M.S. saw Dr. Nancy Hohler (audiologist at Primary Children's Hospital who has a doctorate in audiology) and underwent a sedated ABR test in September 2010.  The test results provided that M.S. has a "mild to moderate, low frequency hearing loss sloping to within normal limits at 2000 and 4000 Hz bilaterally."[28]  The hearing loss was previously unknown.[29]

---

[21] 20 U.S.C. § 1401(9).

[22] *Rowley*, 458 U.S. at 188–89 (citation omitted).

[23] Docket No. 24, at 2125.

[24] *Id.* at 687.

[25] *Id.* at 2638.

[26] *Id.* at 640.

[27] *Id.* at 2125.

[28] *Id.* at 2195.

[29] *Id.* at 694.

Dr. Hohler recommended that the parent consult with audiologists at USDB for consideration of amplification and acknowledged that M.S.'s tactile defensiveness could prohibit it.[30]

USDB received the ABR test results and attempted to determine what effect M.S.'s hearing loss has on her daily life. After reviewing the ABR, Janeal Erikson (audiologist at USDB) informed Carolyn Lasater (Associate Superintendent for the School for the Blind at USDB) in an e-mail that M.S. should have access to quite a bit of speech information.[31] She further indicated that without amplification M.S. might be able to access "some good consonant information, and she may even be able to identify some vowels. Consonants that are probably audible to [M.S.] include: l, r, t, k, f, s, and voiceless 'th' as in 'thing.'"[32] However, Ms. Erikson indicated that M.S. may not be accessing the first formant of most vowels and that M.S. "may be missing a bit of this vowel information—so identification is questionable."[33] A formant is the band of energy, which for most vowels is located in the low frequencies.[34] Ms. Erikson also listed out the sound information that is associated with lower frequencies and indicated that M.S. may not be accessing some of this additional information without amplification. This additional information includes

> discrimination of voiced/voiceless consonants, nasality cues, suprasegmental
> cues: duration, loudness, and pitch, plosive bursts associated with "b" & "d" . . .
> voicing cues, some plosive bursts, some nasality cues, important consonant-vowel

---

[30] *Id.*

[31] *Id.* at 2223.

[32] *Id.*

[33] *Id.*

[34] *Id.* at 3502; *see also* New Oxford American Dictionary 681 (3d ed. 2010) (defining formant as "any of several prominent bands of frequency that determine the phonetic quality of a vowel").

and vowel-consonant transition information, [and] 2nd formant of back and central vowels (i.e. "ah" as in "all," "o" as in "know").[35]

Ms. Erikson indicated that speech cues are going to be harder for M.S. to understand in a noisy classroom.[36] Finally, Ms. Erikson concluded that "[w]ith amplification all vowel sounds (and probably consonants) should be audible to [M.S.]"[37]

Mr. Shaw had concerns about amplification because of M.S.'s tactile defensiveness.[38] He recommended an FM system as it "would provide many of the same benefits in the classroom [as a hearing aid] without causing extra undue stress" related to M.S.'s tactile issues.[39] Mr. Shaw testified that he did not recommend hearing aids for M.S. because he did not think hearing aids were necessary.[40] Mr. Shaw also indicated that he did not believe an FM system was necessary but—if hearing assistance were to be provided—he believed an FM system was the better option.[41]

An amendment to the IEP was signed on May 19, 2011, indicating that M.S. "has been found to have a hearing loss according to a recent ABR. She needs to have modifications in her classroom to support her hearing challenge."[42] The amendment called for an FM system to be used "in the classroom to assist [M.S.] in compensating on her hearing loss."[43] Mr. Shaw

---

[35] Docket No. 24, at 2223–24.

[36] *Id.* at 2224.

[37] *Id.* at 2223.

[38] *Id.* at 2210.

[39] *Id.*

[40] *Id.* at 652.

[41] *Id.* at 654.

[42] *Id.* at 2173.

[43] *Id.*

installed the FM system in M.S.'s classroom and trained M.S.'s teacher on its use.[44] The FM

system was used in M.S.'s classroom the last three days of school during the 2010–2011 school

year.[45] An observation of M.S. on May 31, 2011, indicated that three days of data was too short

of an exposure to the FM system to understand its efficacy thus "more time and training will be

needed to know [if] any auditory system will help her."[46] However, the observer did note M.S.

displayed "increase[d] voice awareness" during the FM system's use.[47]

M.S. had a different teacher for the 2011–2012 school year. The new classroom teacher,

Ms. Hollinger, unilaterally chose not to utilize the FM system. She testified that she felt it was

more important for M.S. to learn to localize sound and that the FM system did not allow for

that.[48] The FM system was apparently not used again until December 14, 2012, when USDB

used the system for one day and produced data that showed the system did not help M.S. on that

day.[49] Based on this one day of data, USDB concluded that the FM system was not benefitting

M.S. and did not propose it as an accommodation in M.S.'s December 2012 IEP.[50]

As for M.S.'s IEP during the 2011–2012 school year, various teachers and related service

professionals were confused about which IEP was to be implemented. The IEP team met on

September 13, 2011, but the IEP was not signed because it was still under construction.[51] The

---

[44] *Id.* at 3880.

[45] *Id.* at 2263.

[46] *Id.*

[47] *Id.* at 2269.

[48] *Id.* at 766.

[49] *Id.* at 3653.

[50] *See id.* at 2696.

[51] *Id.* at 18 (Hearing Officer's May 10, 2013 Order).

IEP team did not meet again until October 29, 2012, which resulted in some service providers continuing to implement the 2010–2011 IEP while others implemented the never-to-be-finalized 2011–2012 IEP. M.S.'s classroom teacher, Ms. Hollinger, testified that she implemented both the 2010–2011 and 2011–2012 IEPs during the 2011–2012 school year.[52] However, M.S.'s classroom teacher did not take any data on the 2011–2012 IEP and sent home progress reports that corresponded to the 2010–2011 IEP goals.[53] The 2011–2012 IEP was implemented by M.S.'s related service providers.[54] By Ms. Hollinger's own account, the IEP amendment to utilize the FM system should have been implemented during the 2011–2012 school year because she was implementing both years' IEPs.

The hearing officer found that discontinuing use of the FM system for the 2011–2012 school year was not a procedural violation as he gave weight to the fact that the FM system was present and operational in the classroom.[55] While the IEP amendment does not explicitly state that a full-time level of use was required, it was reasonable for all parties to expect it to be used, at least until appropriate data could be gathered on the FM system's efficacy. The hearing officer also indicated that M.S. receives her instruction in one-on-one and small group settings, which is correct. However, the classroom where M.S. receives her instruction has been described as a loud classroom that is very verbal with a lot of background noise.[56] Classroom observations indicate that requests were often made of M.S. from across the room and that the

---

[52] *Id.* at 758.

[53] *Id.*

[54] *Id.* at 18 (Hearing Officer's May 10, 2013 Order).

[55] *Id.* at 15, 38–39.

[56] *Id.* at 1188, 1651.

teacher sometimes communicated with M.S. only verbally.[57]  The hearing officer also indicated

that M.S.'s teacher felt that she needed to learn to localize sound, which was not possible when

using an FM system because of how the system broadcasts sound.[58]  The hearing officer did not

acknowledge that Dr. Norman, who holds a doctorate in audiology, did not believe that an FM

system would impair the opportunity for M.S. to localize sound.[59]  Regardless of M.S.'s need to

localize sound, an FM system was a required program modification of M.S.'s IEP, and IDEA

requires it to be implemented.

The Court finds that because the May 2011 amendment to M.S.'s IEP called for an FM

system to assist her in the classroom, and because that FM system was not used at all during the

2011–2012 school year, there has been a procedural violation of IDEA.

        *b.*     *Compensable Violation*

Having found a procedural violation of IDEA, the Court must next determine if that

violation is compensable.  Technical deviations from IDEA's requirements do not entitle a

student to relief unless that deficiency causes substantive harm to the child or parent, deprived

the child of an IEP, or resulted in the loss of an educational opportunity.[60]  Simply put, the

violation must result in a denial of a FAPE to be compensable.[61]

Plaintiff's own expert reports indicate that an FM system *may* benefit M.S., not that it

was *essential* in order for M.S. to access her educational environment.  It is true that the relevant

---

[57] *Id.* at 1340, 1385, 2881.

[58] *Id.* at 766.

[59] *Id.* at 713.

[60] *Systema*, 538 F.3d at 1313.

[61] *Id.*

professionals do not know how necessary an FM system is for M.S. Dr. Hohler testified that not all children with M.S.'s levels of hearing loss require amplification and some children are symptom free "particularly in children with normal cognition."[62] However, for students with a hearing loss on top of near total blindness, even a mild hearing loss cannot be discounted.[63] M.S.'s 2011–2012 classroom teacher acknowledged in the September 2011 IEP meeting that "we have not found out yet what works best for [M.S.] We need to try different modes and see what we can get."[64]

In *Urban by Urban v. Jefferson County School District R-1*,[65] the Tenth Circuit found no denial of a FAPE where a student's IEP lacked an explicit statement of transition services and did not designate an outcome for the student when he reached twenty-one years of age.[66] However, the court found that the student received and benefitted from transition services, and only a statement of transition services was missing.[67] The court noted that "[i]t is important to distinguish between the statement of transition services in the IEP and the provision of transition services."[68] Similarly, in *O'Toole v. Olathe District Schools Unified School District No. 233*,[69] the Tenth Circuit held there was no denial of a FAPE where the IEP stated that related services would be provided "as appropriate" and the evidence showed that the student was not ever

---

[62] Docket No. 24, at 643.

[63] *Id.* at 999, 1177, 2893–900, 2902.

[64] *Id.* at 2412.

[65] 89 F.3d 720 (10th Cir. 1996).

[66] *Id.* at 726.

[67] *Id.*

[68] *Id.*

[69] 144 F.3d 692 (10th Cir. 1998).

denied any related services sought for her by her parents.[70]  The court noted, "While we do not condone statements that related services will be provided 'as appropriate,' and while we recognize that the District should specify in its IEPs the level at which such services will be provided, we hold that these technical irregularities did not produce . . . a violation of . . . the IDEA."[71]

The *Urban* and *O'Toole* cases both describe situations in which a related service was not well stated and yet was provided.  The case at hand, however, is a situation in which a program modification was stated yet not provided.  The hearing officer gave deference to the professional expertise of the classroom teacher who unilaterally chose not to implement the IEP amendment in question.  While some deference should be given to teachers, the IEP is created by a team of individuals with various areas of expertise and requires the classroom teacher to implement the components, even the ones that the teacher may not agree with or care to implement.  In M.S.'s case, her IEP team meetings were attended by upwards of twenty individuals.[72]  The IEP process cannot be trumped unilaterally by the person trusted to implement its provisions.

Every audiologist on record except for Mr. Shaw has recommended amplification for M.S.  While hearing may be a strength for M.S., this strength still describes a mild to moderate hearing loss.  A child with a vision loss, like M.S., must especially rely upon hearing to compensate for the lack of available visual information.[73]  Dr. Norman, who saw M.S. on March 26, 2013, indicated that "[i]t is recommended that even a mild hearing loss be treated with

---

[70] *Id.* at 707.

[71] *Id.*

[72] Docket No. 24, at 2991.

[73] *Id.* at 1117, 2893–900, Pl. Ex. 140, at 3:57:50.

amplification.  [M.S.] could receive benefit from binaural behind-the-ear hearing aids with her

hearing loss.  She may also benefit from the use of an FM system."[74]  Mr. Shaw's opinion might

be given more deference except he, and others at USDB, appear to minimize M.S.'s hearing

loss.[75]        Because experts can indicate only that M.S. *may* benefit from an FM system, it is

difficult for the Court to determine whether this IDEA procedural violation caused substantive

harm to M.S., deprived her of an IEP, or resulted in the loss of an educational opportunity.

Unfortunately, M.S. is unable to communicate with professionals to aid them in determining

whether the FM system is of any assistance.  We do know that M.S. "can hear many

environmental sounds, but discriminating speech and its meaning is more difficult for her."[76]

Ms. Erickson indicated that with amplification M.S. could hear "all vowel sounds (and probably

consonants)" while without it M.S. "should be hearing many of the consonants, and may be able

to identify some vowels in loudness levels of normal conversational speech."[77]

　　　　USDB was required to take M.S.'s hearing loss into account once it was known.[78]  M.S.

cannot be expected to receive any educational benefit from her IEP if the team does not consider

and implement agreed-upon supports that address her hearing loss.  The original

recommendation was for M.S. to receive hearing aids.  The hearing aid recommendation was

---

[74] *Id.* at 2902.

[75] Some examples of USDB's downplaying of M.S.'s hearing loss include: M.S.'s 2011–2012 IEP does not even describe the hearing loss.  *Id.* at 2388–902.  USDB has described the loss as being unilateral instead of bilateral.  *Id.* Pl. Ex. 140, at 4:05:55.  Additionally, USDB referred to M.S.'s hearing loss as "negligible." *Id.* at 2236–38.

[76] *Id.* at 2895.

[77] *Id.* at 2223–24.

[78] *Lamoine Sch. Comm. v. Ms. Z. ex rel. N.S.*, 353 F. Supp. 2d 18, 37 (D. Me. 2005) (holding that IEP denied FAPE because all areas of learning disabled student's needs not recognized in IEP).

changed to an FM system because of concerns that M.S. would not tolerate in-ear hearing aids. USDB did not try to use a hearing aid with M.S. nor did USDB include in M.S.'s IEP a program to desensitize her ears so that she could wear hearing aids. Because M.S. has cognitive impairments, autism, hearing loss, and no usable vision, M.S.'s strength in her hearing must be maximized to obtain some educational benefit from her IEP.

Disregarding the use of the FM system for the 2011–2012 school year without notifying M.S.'s mother significantly impeded M.S.'s mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to M.S. It also impeded M.S.'s right to a FAPE, and caused a deprivation of an educational benefit to M.S. The Court finds that prior written notice to M.S.'s mother was required before the FM system could be discontinued and the failure to utilize the FM system or notify the parent resulted in a denial of a FAPE during the 2011–2012 school year. The Court will award M.S. compensatory educational services for this violation.

4.    *Failure to Provide Written Notice Regarding Changes to the 2011–2012 IEP*

Plaintiff claims that USDB failed to provide prior written notice regarding changes to the 2011–2012 IEP. The hearing officer did not find references in the record that changes were made to the 2011–2012 IEP, nor does this Court. Further, the Court finds that this issue was not adequately briefed. Accordingly, Plaintiff has failed to prove by a preponderance of the evidence that there were changes made to the 2011–2012 IEP and therefore the Court finds that Plaintiff has not met her burden of proof on this issue.

B.    SUBSTANTIVE ISSUES

The United States Supreme Court has held that the "'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child."[79]  A state need not provide services "sufficient to maximize each child's potential."[80]  A school provides a FAPE as long as it has a procedurally sound IEP in place that is reasonably calculated to enable the child to receive some educational benefit.[81]

*1.    Reimbursement of IEE Costs*

The first substantive issue is whether USDB is obligated to reimburse Plaintiff for travel-related expenses incurred in connection with M.S.'s IEE conducted by Perkins in Massachusetts during March 2012.

If a parent disagrees with an evaluation obtained by the district, a parent may request an IEE at public expense.[82]  The parents of a child with a disability have the right to select the evaluators who meet agency criteria.[83]  Once a parent requests an IEE, "[t]he public agency must, without unnecessary delay, either file a due process hearing to show that its evaluation is appropriate or ensure that an IEE is provided at public expense unless the district demonstrates in a hearing that the IEE did not meet agency criteria."[84]  "Public expense means that the public

---

[79] *Rowley*, 458 U.S. at 201.

[80] *Id.* at 198.

[81] *Thompson*, 540 F.3d at 1148–49.

[82] 34 C.F.R. § 300.502(b)(1).

[83] *Id.* § 300.502(a)(1).

[84] *Id.* § 300.502(b)(2)(i)–(ii).

agency either pays for the full cost of the evaluation or ensures that the evaluation is otherwise provided at no cost to the parent . . . ."[85]

M.S.'s mother incurred $1,198.80 in personal costs related to the IEE conducted at Perkins. She incurred $240.00 for lodging and $958.80 for flights.[86] The hearing officer denied reimbursement stating that "[n]owhere in the statutory scheme does it require a public agency to reimburse the cost of unnecessary travel expenses, especially when the necessary services were available within the community."[87]

The desire to have an IEE was thoroughly discussed in the September 2011 IEP meeting. At that point USDB had placed a $2,000.00 cap on the expenses for an IEE.[88] However, because M.S.'s hearing loss had only recently been diagnosed, M.S.'s mother discussed at that meeting the need to have a deafblind IEE rather than an IEE for blindness and autism. USDB then acknowledged that there were no deafblind specialists in Utah who could conduct the IEE because the Utah experts are all at USDB.[89] USDB noted that they would have to "add more to the pot" to account for the deafblind IEE.[90] To conduct the deafblind IEE from the list provided, M.S.'s mother would have had to utilize an out-of-state expert, Marilyn Gense, who would require transportation costs from Oregon. Her fee is listed as "$1,500 per day plus travel

---

[85] *Id.* § 300.502(a)(3)(ii).

[86] Docket No. 24, at 1445, 2848–52.

[87] *Id.* at 42.

[88] *Id.* at 2197.

[89] *Id.* Pl. Ex. 138, at 4:46:00–4:47:30.

[90] *Id.* Pl. Ex. 137, at 4:48:12.

expenses (airfare, transportation, lodging, meals)."[91]  M.S.'s mother would also have had to put together additional individuals to form a team to conduct a comprehensive IEE as Ms. Gense is not a speech therapist or an occupational therapist.  Thus, the hearing officer was incorrect when he found that the necessary services were available in the community.

USDB put together a list of qualified individuals who were capable of conducting M.S.'s IEE.[92]  That document makes it apparent that because of M.S.'s complicated issues, an IEE, even one conducted in Utah, would have exceeded the $2,000.00 cap provided by USDB.  Based on the information from the IEP meeting, the Court finds that M.S. could not have received a deafblind IEE in Utah at the cost of $2,000.00.

USDB argues that M.S. and her mother's travel expenses to Massachusetts were unnecessary costs but does not acknowledge that travel costs, whether incurred to transport M.S. and her mother to Massachusetts or to bring a qualified team of experts to Utah to evaluate M.S., were a necessary and reasonable expense required to perform M.S.'s IEE.  Moreover, USDB is statutorily required to conduct a reevaluation of each student at public expense every three years.[93]  USDB utilized the Perkins IEE for M.S.'s three-year reevaluation, ultimately saving USDB reevaluation costs.[94]

The Court finds that USDB is required to reimburse M.S.'s mother for her out-of-pocket expenses incurred in conducting M.S.'s IEE because the travel costs were reasonable and justifiable and because the Perkins IEE was also utilized as M.S.'s three-year reevaluation.

---

[91] *Id.* at 2203.

[92] *Id.* at 2197.

[93] *See* 34 C.F.R. § 300.303(b)(2).

[94] Docket No. 24, at 608, 1916–17, 2585.

2.      *Appropriateness of the 2010–2011 and 2011–2012 IEPs*

Plaintiff next argues that the 2010–2011 and 2011–2012 IEPs were inappropriate for a variety of reasons, including that the sections that describe M.S.'s present level of academic achievement and functional performance ("PLAAFP") are deficient, the IEPs are skill-based rather than based on concepts, and the IEPs failed to include behavior strategies and appropriate speech and language services. Plaintiff also argues that the IEPs were inadequate because they were composed of repeated and recycled goals that were not measurable and because they failed to include task analysis.

In creating the IEPs for M.S., USDB considered M.S.'s classroom teacher's input, M.S.'s mother's input, the input of related services providers, assessments, and data where available. Her goals were individualized. The PLAAFPs adequately described M.S.'s functional performance, although they could have done more to address M.S.'s hearing loss. The PLAAFPs described multiple methodologies including an object/symbol communication system, verbal and physical prompts, braille instruction, and hand-over-hand techniques.

Plaintiff argues that M.S.'s goals should be concept-based. A school district has the right to select a program for a special-education student as long as the program is able to meet the student's needs and the IDEA does not empower a parent to make unilateral decisions about methodology.[95] Plaintiff's argument about concept-based learning is a methodology argument. Therefore, the IEP is adequate on this ground.

---

[95] *Rowley*, 458 U.S. at 208 (finding that "once a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the States").

Plaintiff argues that the IEP is inadequate because M.S. did not have a behavior intervention plan ("BIP") in her IEPs. M.S. has behavioral problems—such as biting, pinching, grabbing her head—and self-stimulating problems—including rocking and flapping her arms. However, there was testimony that M.S.'s behaviors were infrequent and of a short enough duration that the IEP team did not feel a BIP was necessary. While a BIP could have been utilized for M.S., it was not required for M.S. to receive a FAPE because there was no evidence presented that her behavioral problems affected her receiving a FAPE.

Plaintiff also argues that after M.S.'s hearing loss was diagnosed, her IEP should have required hearing aids. M.S.'s 2011–2012 IEP needed to acknowledge M.S.'s recently diagnosed hearing loss, but it did not have to acknowledge it by including hearing aids. While amplification was recommended, the testimony provides that, because of tactile defensiveness, the decision to provide that amplification via an FM system was reasonably calculated to provide M.S. with educational benefits. Therefore, there was no violation on this ground.

There is some confusion about whether M.S. received all of her required service minutes and whether her service minutes were adequate for her severe needs. M.S.'s 2009 IEP provided M.S. with only twenty-five minutes of speech and language services per month, which the Court finds to be inadequate for M.S.'s needs. Service times were carried over to M.S.'s 2010–2011 IEP; therefore she received only twenty-five minutes a month of speech language services. While inadequate in retrospect, these service minutes were developed before M.S.'s hearing loss was known and therefore were adequate at the time they were developed.

After M.S.'s hearing loss was diagnosed, her IEP service times were adjusted so that she would receive sixty minutes a month of services by a speech language pathologist. The issue is

whether M.S's service times were adequate for a child with M.S.'s severe speech and language needs.

An educational agency in formulating a special education program for a disabled pupil is not required to furnish every special service necessary to maximize the child's potential.[96] Given that M.S.'s speech and language training was to be direct and consultative, and implemented across all environments, the Court finds M.S.'s service times to be minimal, yet reasonably calculated to provide M.S. with some educational benefit.

Finally, recycling goals year after year despite no more than minimal progress is an indicator that a student may be denied a FAPE.[97] IEP "goals and objectives must be realistic and attainable" and if the IEP is not working "a reevaluation must be done so that the child can obtain educational benefit in the future."[98]

Plaintiff's argument about using repeated and recycled goals for M.S. is undercut by the fact that testimony by experts on both sides shows that M.S. makes slow progress, such that goals must continue to be reviewed and revised. Because of M.S.'s slow progress, several goals were similar year-after-year, although they often included different short-term objectives to assist in meeting the overarching goal. The goals, as written, are individualized and appropriate for M.S. and tied to the PLAAFPs. M.S.'s IEPs, if implemented properly, were reasonably calculated to provide M.S. with educational benefit.

---

[96] *Id.* at 199.

[97] *D.B. v. Bedford Cnty. Sch. Bd.*, 708 F. Supp. 2d 564, 585–88 (W.D. Va. 2010).

[98] 99 Am. Jur. Proof of Facts 3d 237 (2008).

In light of the low threshold of what is required of an IEP in order for a student to receive some educational benefit, the Court finds that M.S.'s IEPs were reasonably calculated for M.S. to receive some educational benefit.

### 3. Implementation of IEPs

The third substantive issue is whether USDB failed to properly implement the IEPs for the two-year period immediately preceding the filing of Plaintiff's due process complaint, thereby failing to provide educational benefit to M.S. Plaintiff argues that M.S.'s dual sensory loss was not taken into account by USDB. Plaintiff argues that M.S. is entitled to tactile sign language, consistent object cues, as well as the use of total communication strategies to educate M.S.

### a. Materiality Standard

School districts should strive to follow IEPs as closely as possible, though the IDEA does not require perfect adherence to a child's IEP. To comply with IDEA, schools must satisfy the procedural requirements of the Act and provide an appropriate education "in conformity with" an IEP.[99] Minor discrepancies between the services provided and the services called for by the IEP do not give rise to an IDEA violation.[100]

In addressing a claim challenging the implementation of an IEP, many courts apply a materiality standard that requires only substantial compliance with an IEP. Under this framework, a school is found to offer a FAPE, even when it fails to implement portions of an IEP as long as those provisions are not deemed substantial, and the student otherwise makes progress

---

[99] 20 U.S.C. § 1401(9).

[100] *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 821 (9th Cir. 2007).

on annual goals.[101]  Stated differently, Plaintiff "must show more than a *de minimis* failure to implement all elements of that IEP and instead must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP."[102]

Other courts, however, have applied a *per se* rule to implementation challenges, under which a failure to implement any portion of an IEP denies a FAPE.[103]  The dissent in *Van Duyn ex rel. Van Duyn v. Baker School District* advocates for this approach, noting that

> an IEP is the product of an extensive process and represents the reasoned conclusion of the IEP Team that the specific measures it requires are necessary for the student to receive a . . . FAPE.  A school district's failure to comply with the specific measures in an IEP to which it has assented is, by definition, a denial of FAPE.[104]

The dissent further notes that "[j]udges are not in a position to determine which parts of an agreed-upon IEP are or are not material.  The IEP Team . . . is the entity equipped to determine the needs of a special education student, and the IEP represents [that] determination."[105]

The Tenth Circuit has not explicitly adopted either standard, but based on its reasoning in other cases, appears to espouse the materiality standard.[106]  "[T]he materiality standard does not require that the child suffer demonstrable educational harm in order to prevail" on a failure-to-

---

[101] *Id.* at 818; *Neosho R-V Sch. Dist v. Clark*, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003); *Hous. Ind. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000).

[102] *Bobby R.*, 200 F.3d at 349.

[103] *D.D. ex rel. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 512 (2d Cir. 2006) ("IDEA does not simply require substantial compliance; . . . it requires compliance.").

[104] *Van Duyn*, 502 F.3d at 827 (Ferguson, J., dissenting).

[105] *Id.* (citations omitted).

[106] *O'Toole*, 144 F.3d at 707; *Miller ex rel S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 455 F. Supp. 2d 1286, 1312 (D.N.M. 2006) (affirming a hearing officer's order for compensatory relief due to improperly implemented IEP where the IEP called for books on tape yet these assistive technologies were not provided on a consistent basis), *aff'd*, 565 F.3d 1232 (10th Cir. 2009).

implement claim.[107]  Rather, "courts applying the materiality standard have focused on the proportion of services mandated to those actually provided, and the goal and import (as articulated in the IEP) of the specific service that was withheld."[108]

        *b.*       *M.S.'s 2010–2011 and 2011–2012 IEPs*

M.S.'s 2010–2011 IEP classifies her as a student with multiple disabilities including autism and blindness.[109]  She requires a setting "with an appropriate functional academic curriculum, close proximity instruction, a favorable ratio of student to staff, appropriate therapies, and a strong behavioral support system."[110]  "She is non-verbal and uses a tactile schedule system."[111]  "[O]n occasion . . . she produces word-like vocalizations which are then reinforced with standard words."[112]  This IEP describes her as being able to follow a toileting routine well and being able to walk into the bathroom independently when she needs to go.[113]  She complies with familiar one- and two-step directions on a consistent basis.[114]  Her goals include a communication goal of using an object/symbol communication system in combination with verbal-gesture cues and grasping said system independently,[115] a self-care goal to improve

---

[107] *Van Duyn*, 502 F.3d at 822.

[108] *Wilson v. District of Columbia*, 770 F. Supp. 2d 270, 275 (D.D.C. 2011) (citing *Van Duyn*, 502 F.3d at 822).

[109] Docket No. 24, at 2174.

[110] *Id.*

[111] *Id.* at 2175.

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.* at 2179.

her independence by doing things such as eating with a utensil and wiping with a napkin,[116] and a language-arts goal to respond to three-step requests.[117]  She also had an orientation-and-mobility goal to travel safely and efficiently in her school environment,[118] a science goal to independently prepare a simple snack,[119] math goals to sort and organize objects independently and to do a three-piece puzzle,[120] and a reading goal to use tactile discrimination to explore objects and braille symbols.[121]

M.S.'s 2011–2012 IEP describes her as a nonverbal student who uses a tactile schedule system, who communicates through body movements such as turning away, using simple hand movements, and reaching toward items.[122]  M.S. uses babbling and simple gestures.[123]  M.S.'s goals include a communication goal of using an object/symbol communication system in combination with verbal and gesture cues to make requests within structured activities.[124]  Some of the short-term objectives include grasping the communication system, demonstrating a consistent response to indicate a desired activity or object, associating symbols with the objects they represent, and indicating a desire to discontinue activities without incidents of aggression.[125]

---

[116] *Id.* at 2180.

[117] *Id.* at 2183.

[118] *Id.* at 2182.

[119] *Id.* at 2184.

[120] *Id.* at 2185–86.

[121] *Id.* at 2187.

[122] *Id.* at 2393.

[123] *Id.*

[124] *Id.*

[125] *Id.*

M.S. also had goals to improve her independence with self-care by using a spoon, a napkin, soap, and brushing her teeth.[126]  She also had goals to follow one-step and two-step directions and learn three new routes on the school campus.[127]  Additionally, there was an objective for M.S. to use a tactile symbol to indicate her desire to use the restroom.[128]  M.S. did not meet any of the goals from the 2010–2011 IEP even though that IEP was implemented for two years.  Data does not appear to have been taken on the 2011–2012 IEP during the 2011–2012 school year and progress reports were not sent home for the 2011–2012 goals.[129]

       *c.*     *Failure to Provide a Consistent Communication System to MS*

M.S.'s 2010 communication goal was to "use an object/symbol communication system in combination with verbal-gesture cues, [to] grasp and hold objects from a communication system with minimal physical and verbal prompts 4 out of 5 opportunities over 5 data sessions by May 2011."[130]  M.S.'s 2011–2012 IEP goal for communication was to "use an object/symbol communication system in combination with verbal/gesture cues to make requests/choices within structured activities by September 2012."[131]  One of the objectives for the 2010–2011 IEP goal was for M.S. to make "choices from a group of two options using tactile representations for

---

[126] *Id.* at 2395.

[127] *Id.* at 2397.

[128] *Id.* at 2395.

[129] *Id.* at 758.

[130] *Id.* at 2179.

[131] *Id.* at 2975.

preferred activities."[132]  One of the objectives for the 2011–2012 goal was for M.S. to

"demonstrate association of symbol[s] to 10 different objects or activities."[133]

Despite goals to use an object/communication system, USDB teachers changed the object

cues for M.S.'s communication system every year between 2010 and 2013.[134]  Ms. Hollinger

testified that she used a piece of M.S.'s diaper as the object cue for the bathroom but it was a

different cue from what Ms. Hadley used the year before.[135]  The following year Ms. Anderson

changed the cue to an empty toilet paper roll.[136]  Similarly, a bathroom switch was used in 2010

and in 2011 but then given to M.S.'s mother and so was not utilized during the 2012–2013

school year.[137]  The cue for lunch similarly changed from a spoon to a fork then back to a

spoon.[138]  USDB acknowledged the cues were changed because of staff changes.[139]  M.S. had

one teacher (Ms. Hadley) for the first five years she was at USDB and then had six different

teachers between 2010 and 2013.  This included four different teachers during the 2012–2013

school year alone.[140]

It is unclear why tactile signing was used inconsistently during the 2011–2012 school

year.  During the 2010–2011 school year, after learning about M.S.'s hearing loss, Ms. Hadley

---

[132] *Id.* at 2179.

[133] *Id.* at 2975.

[134] *See generally id.* at Pl. Ex. 138–41.

[135] *Id.* at 761.

[136] *Id.* at 760.

[137] *Id.* Pl. Ex. 140, at 1:57:17.

[138] *Id.* at 914, 2629.

[139] *Id.* Pl. Ex. 140, at 1:58:28.

[140] *Id.* at 1997–98.

began using thirty different tactile signs with M.S.[141]  Ms. Hadley reported that M.S. was responsive to the tactile signing and was occasionally spontaneously signing a few phrases by the end of the year.[142]  Ms. Hadley testified that she left a binder of all communication signs for M.S. with the new teacher.[143]  However, Ms. Hollinger implemented a new communication system for M.S., changed her object cues, and discontinued the use of the thirty tactile signs that Ms. Hadley had been teaching.[144]  While Ms. Hollinger failed to use any of the tactile signs herself, she testified that some of the classroom aides utilized the signs "sporadically."[145]  When asked if Ms. Hollinger worked on the tactile sign for "more," a sign the school claims M.S. has worked on for years, Ms. Hollinger testified that M.S. worked on it "here and there, but it was not a consistent thing."[146]  Ms. Hollinger testified that M.S. has not shown an aptitude for tactile signing and does not maintain the signs taught to her.  However, Ms. Hadley indicated that M.S. showed an aptitude for tactile signing as soon as Ms. Hadley was informed of M.S.'s hearing loss and began implementing tactile signs.[147]  Ms. Hearn re-implemented tactile signing the beginning part of 2013.[148]

---

[141] *Id.* at 914, 2855.

[142] *Id.* at 2855–78.

[143] *Id.* at 915–16.

[144] *Id.* at 759, Pl. Ex. 138, at 40:05–42:10.

[145] *Id.* at 760, 882.

[146] *Id.* at 875.

[147] *Id.* at 911.

[148] *Id.* at 1985.

USDB admits that it "probably would have been better to keep the same symbols."[149] Despite the changes in M.S.'s object/symbol communication system and visual cues, and discontinuing tactile signs during 2011–2012 school year, USDB insists there has been no violation of IDEA because the educational method of using visual cues stayed the same.[150] When asked why the symbols changed when M.S. needs repetitions to learn, Ms. Finch stated that "the symbol [used] doesn't matter because [M.S.] is understanding the oral communication."[151]  However, even if M.S.'s hearing is sufficient to receptively receive language, the record demonstrates that symbols still matter for M.S. to develop expressive language.

Susan Patten (USDB lead teacher specialist for deafblind services) testified that M.S. needed to have meaning to respond to information.[152]  Ms. Patten gives the example of a command for M.S. to put her feet down.  Because M.S. knows what is required of her, she puts her feet down.[153]  The problem then with Ms. Finch's assessment that M.S.'s symbols do not matter because M.S. understands oral communication is that M.S. cannot express language orally.  Linda Alsop (Plaintiff's expert and director of deafblind programs at the SKI-HI institute at Utah State University) testified that sign language is important for students who cannot

[149] *Id.* Pl. Ex. 140, at 1:58:28.

[150] *Id.* Pl. Ex. 140, at 2:29:37.

[151] *Id.* Pl. Ex. 140, at 2:32:44.

[152] *Id.* at 1684.

[153] *Id.*

express themselves using oral communication because it helps students "be expressive themselves."[154]

Observers in the classroom cite other implementation failures. Cheralyn Creer (Plaintiff's expert and coordinator of a program for transition-aged blind youth) recounts that during her observation of M.S., USDB staff asked M.S. if she wanted to jump on the trampoline or swing, yet provided M.S. with a communication board that allowed her only a yes or no response.[155] Ms. Creer testified that when she observed M.S.'s classroom, M.S.'s communication device was often out of M.S.'s reach and then only handed to her when an aide wanted a response from her.[156] Ms. Alsop similarly testified that she never saw a calendar system, voice output choice board, or other techno cues being used with M.S.[157]

Although parents do not have the right to dictate methodology, methodology was not changed. It was the implementation of M.S.'s methodology that was not consistently performed. Because of M.S.'s need for consistency, and for both receptive and expressive communication skills, M.S.'s teachers were required to make efforts to continue the use of the same communication cues and to continue using tactile signs coupled with voice. Taken alone, this implementation problem poses only a *de minimis* failure to properly implement M.S.'s IEP but is more concerning when all implementation failures are considered in the aggregate.

---

[154] *Id.* at 955.

[155] *Id.* at 1387.

[156] *Id.* at 1386.

[157] *Id.* at 1339–40, 2894–900.

        *d.*      *Failure to Provide Consistency Across Environments*

Despite testimony that M.S. needed consistency across all environments, M.S.'s mother did not know and was never trained in how to use M.S.'s communication cues at home.[158] M.S.'s mother requested consultative speech and language parent training, although USDB's speech language pathologist testified that she never provided it.[159] M.S.'s program was also not consistently implemented in the residential program. Trena Roueche (USDB director of residential services) testified that dorm staff had been using tactile signs with M.S. for the past seven years, but M.S. does not remember the signs.[160] Her testimony is seemingly contradicted by written instructions sent to dorm staff on October 27, 2012, instructing them to begin using five particular tactile signs with M.S.[161] Ms. Roueche also did not have any data on M.S.'s progress with tactile signs and the total communication approach the residential services claims they were implementing, although she admits data would be necessary to know whether tactile signing has been effective for M.S.[162] Object cues were also not used at all in the dorms at least up until September 2011.[163] At the September 2011 IEP meeting, dorm staff admitted, "We didn't have any cues. I didn't know that there even were any cues used in the classroom. That information wasn't relayed to us."[164]

---

[158] *Id.* Pl. Ex. 138, at 41:35.

[159] *Id.* at 1760.

[160] *Id.* at 2001.

[161] *Id.* at 2611.

[162] *Id.* at 2012–14.

[163] *Id.* Pl. Ex. 138, at 42:10.

[164] *Id.*

Ms. Lasater testified and the hearing officer found that the residential program is a place that students live so that they can access their educational environment during the day.[165] But when pressed, she agreed that the residential program should be utilized to implement IEP goals and employ the same methods as the child receives during the day.[166] Taken alone, this may not be significant, but coupled with the other implementation problems during the 2011 year, that nobody from M.S.'s IEP team provided training for residential staff and M.S.'s mother is problematic, because it limited the consistency available to M.S. This is particularly troubling because M.S. needs thousands of repetitions[167] and consistency to learn. This needed consistency across environments is one of the benefits of a residential school. One of the benefits of the Perkins program is that M.S. would receive consistency in all environments. Because of M.S.'s need for consistency and repetition, this implementation problem poses a material and substantial failure to properly implement M.S.'s IEP.

         *e.*     *Failure to Implement All Speech Language Pathology Services*

"A school district's failure to provide the number of minutes and type of instruction guaranteed in an IEP could support a claim of material failure to implement an IEP."[168] M.S.'s 2010–2011 IEP provides for 25 minutes of speech language pathology services per month.[169] M.S.'s 2011–2012 IEP does not provide for speech language pathology service minutes, but Ms.

---

[165] *Id.* at 7.

[166] *Id.* at 735–37.

[167] *Id.* at 1713.

[168] *N.D. ex rel. Parents Acting as Guardians ad Litem v. Haw. Dept. of Educ.*, 600 F.3d 1104, 1117 (9th Cir. 2010).

[169] *Id.* at 2171.

Finch (speech language pathologist for USDB) testified that she was to provide sixty minutes per month of speech language services to M.S. during the 2011–2012 school year.[170]

The hearing officer found that he could not determine if M.S. received all of her speech service minutes during the 2011–2012 school year. There is also confusion over how much of M.S.'s speech language therapy was provided as direct service.[171]

Ms. Finch testified that she provided direct and consultative services to M.S.[172] Direct services are provided directly to the student while consult services are provided to other service providers so that everyone in her educational environment is taught to work with M.S. throughout the day.[173] However, in the October 2012 IEP meeting, Ms. Finch indicated that she did not keep speech language data because she was only a consultative therapist who provided M.S. no direct services at all.[174] The number of service minutes was left blank on M.S.'s 2011–2012 IEP because the IEP was never finalized.[175]

The Court finds that USDB was obligated to provide M.S. with sixty minutes of speech language direct and consultative therapy per month during the 2011–2012 school year, based on Ms. Finch's testimony. The therapist contact list indicates that M.S. only received a partial amount of speech language services for four of the nine months during the 2011–2012 school

---

[170] *Id.* at 1726.

[171] *Id.* at 1756–67. In the hearing Ms. Finch testified that she provided direct and consultative services but, in the October 2012 IEP meeting, Ms. Finch indicated that she only provides consultative services to M.S. *Id.* Pl. Ex. 140, at 2:08:14.

[172] *Id.* at 1709.

[173] *Id.* at 628, 1742.

[174] *Id.* Pl. Ex. 140, at 2:08:14.

[175] *Id.* at 2970.

year,[176] showing M.S. was deprived of seventy minutes of speech language services during that year.[177]

There is also a question about how much of the speech language services were provided directly to M.S. M.S. requires direct speech language services.[178] USDB was aware that Ms. Finch preferred to provide only consultative services. A December 11, 2012 e-mail from Ms. Hearn to Ms. Lasater acknowledged that Ms. Finch was required under the 2012–2013 IEP to provide direct services to M.S. Ms. Hearn wrote, "Communication being the top issue for [M.S.,] this should be direct. [Ms. Finch] prefers consult with all our students, but in this case she needs to be direct."[179] Ms. Finch indicated in the October 2012 IEP meeting that she was only there to consult.[180]

Based on the above, the Court finds that M.S. did not receive all of her speech language services minutes during the 2011–2012 school year and that Plaintiff has shown by a preponderance of the evidence that M.S. did not receive direct speech language services. This implementation failure, taken alone, constitutes a *de minimus* failure to implement M.S.'s 2011–2012 IEP.

### f. Regression

In determining whether an IEP was implemented appropriately, courts consider whether there was regression. However, the materiality standard does not require that a child suffer

---

[176] *Id.* at 3386–96.

[177] *Id.*

[178] *Id.* at 1087–88.

[179] *Id.* at 2650.

[180] *Id.* Pl. Ex. 140, at 2:04:14.

demonstrable educational harm in order to prevail.[181]  "[T]he child's educational progress, or lack of it, may be probative of whether there has been more than a minor shortfall in the services provided."[182]

The hearing officer found that there was no IDEA implementation violation because M.S. made progress in the areas of orientation and mobility and self-help skills including toileting, cooking, and eating.[183]  The hearing officer did not note any progress in the areas of receptive and expressive speech, language, or communication.  Moreover, given M.S.'s May 2011 end-of-year evaluations and the testimony of Ms. Hadley, there is a strong possibility that M.S. has regressed in the areas of language and communication, the exact same areas where the implementation failures occurred.[184]  USDB wants the Court to dismiss Ms. Hadley's progress reports because of testimony that Ms. Hadley was prone to overstate her students' progress. However, there was also testimony that Ms. Lasater and Ms. Hearn reviewed Ms. Hadley's reports to ensure they were accurate before sending them home.[185]  Therefore, the Court finds Ms. Hadley's end-of-year progress report to be an accurate measure of M.S.'s abilities in May 2011, and supports the finding that M.S. regressed.

Moreover, the Utah Alternative Assessment ("UAA") supports a finding that M.S. has regressed as well.  The UAA is the test that USDB is mandated to administer to disabled students

---

[181] *Van Duyn*, 315 F.3d at 822.

[182] *Id.*

[183] Docket No 24, at 50.

[184] *Id.* at 914–15.

[185] *Id.* at 1972.

to measure their progress and mastery on their special education goals.[186]  The UAA test scores also demonstrate that M.S. has regressed in multiple areas.[187]  M.S.'s 2010 UAA indicated she scored at the highest level of proficiency (Level 4, "substantial") in responding to familiar two-step requests.[188]  That means that M.S. received three correct trials tested by different people, making different requests, in different settings.[189]  However, in M.S.'s 2011 UAA, which tested the same goal of following familiar two-step requests, she received the lowest possible score (Level 1, "minimal") proficiency, meaning she "is not yet proficient on measured standards and objectives of the Curriculum in this subject.  The student's performance indicates minimal understanding and application of key curriculum concepts."[190]  The UAA notes show that M.S. was able to follow two separate one-step instructions but no two-step requests.[191]  During the 2012–2013 school year, USDB continued to work on teaching M.S. one-step directions.[192]  In 2010 and 2011, M.S. received a Level 3 "Sufficient" rating on her math goal of sorting objects based on two or more attributes.  M.S.'s 2012 sorting goal was simplified to sorting objects by only one attribute.[193]  The Court finds M.S. regressed in key areas during the 2011–2012 school year.

---

186 *Id.* at 620

187 *Id.* at 2163, 2228–33, 2588.

188 *Id.* at 2163.

189 *See id.* at 2231.

190 *Id.* at 2233.

191 *Id.* at 2232.

192 *Id.* at 3266.

193 *Id.* at 2163.

### g. Implementation Conclusion

As to the 2010–2011 IEP, the Court finds it was properly implemented. Ms. Hadley tried multiple approaches and was willing to try new approaches when M.S.'s hearing loss became known. Ms. Hadley testified that she used multiple strategies appropriate for children with M.S.'s disabilities. She testified that she implemented tactile signing as soon as she became aware of M.S.'s hearing loss and M.S. made progress on her IEP goals during that year.[194]

However, given the above, the Court finds the 2011–2012 IEP was not properly implemented. Taken alone, some of these implementation failures are *de minimus*, but together the failures are material and substantial. USDB failed to utilize an FM system, failed to provide a consistent and repetitive object cue system, completely disregarded tactile signing, and failed to document sixty minutes of speech language services to M.S. each month. Moreover, USDB cannot document that M.S. received any direct speech language pathology services. USDB also failed to train residential staff and M.S.'s mother on the object cues that were being used so that M.S. could access communication in all her environments.

Taken together, these implementation failures during the 2011–2012 school year are substantial and material. During that same period of time, M.S. regressed in her abilities to communicate via tactile signs, sort objects, and comply with two-step requests. Therefore, the Court finds M.S. was denied a FAPE due to the previously detailed implementation failures during the 2011–2012 school year. The Court will order compensatory educational services for these implementation failures.

---

[194] *Id.* at 911.

### 4. Deafblind Classification

Plaintiff next argues that USDB failed to properly identify M.S. as deafblind and failed to utilize dual sensory loss strategies in M.S.'s post-2010–2011 IEPs. Deafblindness means "concomitant hearing and visual impairments, the combination of which causes such severe communication and other developmental and educational needs that they cannot be accommodated in special education programs solely for students with deafness or students with blindness."[195] The hearing officer found that M.S. might technically be considered deafblind under Utah's definition of deafblind.[196] The hearing officer also considered M.S.'s autism diagnosis.[197] M.S.'s mother argues that the autism diagnosis is suspect because it occurred prior to knowing that M.S. had a hearing loss.

Some experts believe that "deaf-blindness coupled with [a cognitive impairment] is a generally-recognized exclusionary criteria in autism diagnosis because the deaf-blind and [cognitive impairment] make the student present as an autistic child."[198] "[T]he IDEA's language makes the actual needs of the child more important than any formal designation of a particular disability."[199] However, the Tenth Circuit finds the eligibility label to be a relevant factor in IDEA analysis.[200]

---

[195] Utah Admin. Code R277-800-1(j).

[196] Docket No. 24, at 52.

[197] *Id.* at 6.

[198] *Millay v. Surry Sch. Dept.*, No. 1:09-CV-411-JAW, 2010 WL 5288191, at *23 (D. Me. Dec. 8, 2010) (unpublished opinion) (summarizing testimony from a deaf-blindness expert).

[199] *Bell v. Bd. of Educ. of Albuquerque Public Sch.*, No. CIV 06-1137 JB/ACT., 2007 WL 5991062, at *23 (D.N.M. Nov. 28, 2008).

[200] *Id.*

All parties agree that M.S.'s needs should drive services, not the label of her disabilities. The hearing officer noted that "it may be argued that [M.S.] could technically qualify under the Utah definition of deafblind, focusing on a 'label' is clearly less important than focusing on appropriate individualized services for [M.S.]"[201] The hearing officer also noted that a particular label assigned to a child does not drive services, goals, or placement decisions. Even so, Steve Noyce (superintendent at USDB) stated that "one of the things we do is provide a deafblind specialist for every [deafblind] child."[202] Leslie Buchanan (director of deafblind services at USDB) also testified that "[t]he supports that are available in Utah are more extensive and expansive than any state in the nation. Each child who is identified deafblind in our state has the support of a trained deafblind specialist, which cannot be said about anyplace else."[203] Ms. Buchanan also noted that deafblind students in Utah have the support of communication intervenors.[204] Finally, Mr. Noyce also testified that once he became superintendent of USDB he talked with staff and overwhelmingly they indicated they "wanted to teach children who were blind and visually impaired. And they felt like what they were doing was primarily servicing children with severe disabilities."[205] He continued, "They were multidisabled children with intellectual disabilities or autism or orthopedic disabilities and [the staff] felt like they were ill prepared to provide services to those children and it's not what they got in the field for."[206]

---

[201] Docket No. 24, at 54.

[202] *Id.* at 1889.

[203] *Id.* at 1660.

[204] *Id.*

[205] *Id.* at 1885.

[206] *Id.*

Considering the testimony listed above, M.S.'s disability classification may, for all intents and purposes, drive M.S.'s services, goals, and placement decisions.

M.S.'s IEPs must take into consideration her current level of functioning. While M.S.'s functional hearing is purportedly good, additional observation is warranted, and M.S.'s mild to moderate hearing loss cannot be discounted. Her dual sensory loss is complicated by her cognitive impairments and autism, and while the exact limitations of each disability in isolation is unknown, the combination of disabilities has adversely affected M.S.'s receptive and expressive communication and impaired her ability to develop language skills. Given the above, the Court finds that M.S.'s dual sensory loss must be taken into account in her IEPs but finds her classification as multiple-disabled to be appropriate.

     *5.     Placement at Provo School District*

The next substantive issue is whether PSD is an appropriate placement for M.S. The hearing officer found that PSD was not an appropriate placement because M.S. needs intensive one-on-one instruction to learn and benefits from the low student-to-teacher ratio she receives at USDB.[207] The hearing officer further found that PSD was not the least restrictive environment ("LRE").

The IDEA requires that children be educated in the LRE. The IDEA provides,

[T]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and . . . removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.[208]

---

[207] *Id.* at 56.

[208] 20 U.S.C. § 1412(a)(5).

The LRE test in the Tenth Circuit requires courts to "(1) determine[] whether education in a regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily; and (2) if not, determine[] if the school district has mainstreamed the child to the maximum extent appropriate."[209] Plaintiff, as the party challenging the IEP placement, bears the burden of proof in challenging the IEP team's placement decision.[210]

Plaintiff argues that a change to PSD is inappropriate because of the reduction in services available to M.S., because the increase in classroom size and classroom noise, and because M.S. will lack direct and meaningful communication with her peers. M.S.'s mother and Dr. Evans (licensed school psychologist and former teacher of students with visual impairments who offered a consultation report for Plaintiff) did not find the PSD classrooms appropriate for M.S. due to higher student-to-teacher ratio and the crowded classroom.[211] M.S. is currently educated in a classroom of five students with a teacher and two aides. The PSD classroom has twelve to eighteen students and one teacher.[212] When M.S.'s mother visited the PSD classroom, she became concerned that she did not see sign language or symbol communication being used with the students.[213] During the February 2013 IEP meeting, a PSD representative also voiced concerns about the decrease in support that would be available to M.S.[214]

---

[209] *Nebo Sch. Dist.*, 379 F.3d at 976.

[210] *Johnson ex rel. Johnson v. Indep. Sch. Dist. No. 4*, 921 F.2d 1022, 1026 (10th Cir. 1990).

[211] Docket No. 24, at 1454, 2891.

[212] *Id.* at 2070–71.

[213] *Id.* at 1454.

[214] *Id.* at 54 (Hearing Officer's May 10, 2013 Order).

USDB contends that PSD's peer-tutoring program will be made available to M.S. so that she could work with trained peers and those same non-disabled peers would also accompany M.S. into the mainstream school setting to provide her support.[215] More specifically, Ms. Buchanan described the socialization opportunities M.S. would receive at PSD as "socialization [that] extends beyond the classroom. So as the kids are . . . moving about in the halls and things, they'll see their peer tutor friends and they'll say hi to them. They're involved in assemblies and in proms and all of those kinds of things."[216]

The hearing officer concluded and the Court agrees that "it is hard to see how [M.S.] will be able to interact with her non-disabled peers."[217] It is also hard to see how a child who has no expressive language skills, is blind, has hearing loss, and needs consistency to learn, will be able to benefit from a peer-tutoring program at a mainstream high school. Much has been made about PSD's ability or inability to educate M.S. The appropriate question is not whether PSD can provide some lower level of support for M.S. but whether a reduction in the level of support is appropriate for M.S. M.S. needs to be where she can receive intensive services that include one-on-one instruction. Given that she has regressed in key areas, such a reduction in the level of support is not appropriate.

The hearing officer also determined that as M.S. approaches sixteen, the age of transition, being close to her home community and family would be beneficial to her. It is true that being educated at PSD would allow M.S. to be in her home community and to spend more time with her family. Even considering the age of transition, the hearing officer called the placement

---

[215] Docket No. 26, at 19.

[216] Docket No. 24, at 1605.

[217] *Id.* at 56.

change to PSD "premature at best."[218]  Moreover, while proximity to a school near one's home is

a consideration of what constitutes an LRE, so is the need for direct and meaningful

communication with her peers.[219]  Any setting that does not meet M.S.'s communication needs is

not the LRE.[220]  The administrative record illustrates that placement at PSD will not meet M.S.'s

needs because of her intense communication needs and her need for consistency, a high rate of

repetition, one-on-one instruction, and direct and meaningful communication with her peers and

teachers.  The Court finds that Plaintiff proved by a preponderance of the evidence that PSD is

not the appropriate placement for M.S.

6.      *The 2012–2013 IEP*

The next substantive issue is whether USDB failed to propose an IEP for the 2012–2013

school year that is reasonably calculated to enable the student to receive educational benefit.

The testimony showed that in creating appropriate goals for M.S., USDB considered the

IEE recommendations as well as the IEP team's input.  However, the PLAAFP plays loose with

semantics when it states that several audiologists agree that M.S.'s hearing is adequate for speech

and language needs.  M.S.'s 2012–2013 IEP inaccurately notes that "[a]udiologists from Primary

Children's Hospital (Audiologist, Nancy Hohler), Perkins (Audiologists Ellen Branfman and

Vicki Wilson), and USDB (Audiologist, Rob Shaw), agree that [M.S.'s] hearing is adequate for

speech/language needs."[221]  In fact, Dr. Hohler's report does not say that,[222] which Mr. Shaw

---

[218] *Id.*

[219] *Id.* at 1674, 1770, 1922–23, 2013.

[220] *Id.* at 1770.

[221] *Id.* at 3010.

[222] *Id.* at 2194–95.

admitted in his testimony.[223]  Moreover, the Perkins audiologists describe M.S.'s hearing as being adequate for "her communication needs" in a total communication environment and adequate for "speech reception in at least one ear."[224]  The Perkins audiologists do not address expressive speech, receptive speech in the left ear, or the impact of M.S.'s vision loss on her hearing.[225]  Given that the PLAAFP determines goals, in the future M.S.'s PLAAFP should be revised to more accurately account for M.S.'s hearing loss.  However, the Court finds that M.S.'s goals have not been impeded because of the PLAAFP's inaccuracy.

M.S.'s 2012–2013 IEP addresses M.S.'s dual sensory loss by providing M.S. with the services of a deafblind specialist,[226] by using hand-under-hand signing,[227] and providing that M.S. will communicate via a consistent sign, gesture, or voice output device.[228]  The 2012–2013 IEP also includes several dual sensory teaching techniques including tactile signing, voice output devices, object cues, verbal cues, physical prompts, hand-over-hand instruction, hand-under-hand instruction, and an object calendar system.[229]  If implemented consistently, the 2012–2013 IEP is reasonably calculated for M.S. to receive educational benefit.  The results of the Perkins IEE were considered by USDB, which is all that is required of the agency.[230]  Therefore, the

---

[223] *Id.* at 661–62.

[224] *Id.* at 2533.

[225] *Id.*

[226] *Id.* at 2697.

[227] *Id.* at 3288.

[228] *Id.* at 2711.

[229] *Id.* at 2696–722.

[230] 34 C.F.R. § 300.502.

Court finds that M.S.'s 2012–2013 IEP is reasonably calculated to enable M.S. to receive an educational benefit.

7.      *Residential Placement at Perkins*

The last substantive issue is whether a residential placement at Perkins is an appropriate placement in the LRE.  The United States Supreme Court has held that placement in a private school can be appropriate relief under the Act.[231]  The hearing officer agreed that Perkins is a fine school with experienced and capable staff and agreed that M.S. could receive an appropriate education there.  However, because he held a FAPE had been provided to M.S. at USDB, the hearing officer held that the question of whether Perkins is an appropriate placement in the LRE for M.S. is a moot issue.[232]  Because this Court has held that M.S. has been denied a FAPE due to IEP-implementation failures during the 2011–2012 school year and because the FM system was discontinued without notice to M.S.'s mother, the issue of placement must be addressed.

Rather than order a specific placement, the Court will require particular educational compensatory services to be offered to M.S.  M.S.'s IEP team can then determine placement at an appropriate residential school that will provide her with the services ordered.  This way, M.S.'s IEP team, the people most familiar with M.S. and with USDB's services, can determine if USDB or Perkins is an appropriate placement for M.S.

---

[231] *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985).

[232] Docket No. 24, at 61.

## IV.  COMPENSATORY EDUCATION

"[C]ompensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit caused by an educational agency's failure over a given period to provide a FAPE to a student."[233]  Compensatory education is an equitable remedy fashioned to fit an individual student's needs; such services are a surrogate for the education that the student should have received during periods when his IEP was inappropriate such that the student was denied a FAPE.[234]  "Compensatory education should be fashioned to provide 'replacement of educational services the child should have received in the first place.'"[235]  Compensatory education is a "flexible approach" wherein "some students may require only short, intensive compensatory programs targeted at specific problems or deficiencies.  Others may need extended programs, perhaps even exceeding hour-for-hour replacement of time spent without FAPE."[236]  The Court's goal in awarding compensatory education should be to "place disabled children in the same position they would have occupied but for the school district's violations of IDEA."[237]  Compensatory relief should endeavor to put the student in a situation similar to where the student would be had the student received FAPE.[238]

---

[233] *G. ex rel RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 308–09 (4th Cir. 2003).

[234] *Dracut Sch. Comm. v. Bureau of Special Educ. Appeals*, 737 F. Supp. 2d 35, 55 (D. Mass. 2010) (*citing C.G. v. Five Town Comm. Sch. Dist.*, 513 F.3d 279, 290 (1st Cir. 2008)).

[235] *Bell*, 2008 WL 5991062, at *35 (quoting *Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005)).

[236] *Reid*, 401 F.3d at 524.

[237] *Wilson*, 770 F. Supp. 2d at 276.

[238] *See Bell*, 2008 WL 5991062, at *35 (holding that fifteen months of compensatory education is appropriate to remedy a fifteen-month deficiency in receiving FAPE); *Woods v.*

The parties agree that if M.S. were denied a FAPE, she would need intensive services to remediate for the time she was denied a FAPE.[239]  M.S.'s 2011–2012 IEP was improperly implemented and denied her a FAPE.  The Court notes it was not until February 4, 2013, that her 2012–2013 IEP was implemented.  For that reason, the Court will Order that M.S. is entitled to an academic year-and-a-half of compensatory education, the period of time M.S.'s 2011–2012 IEP was being implemented.[240]

M.S. will be enrolled in a classroom at a residential program with a teacher and staff who specialize in teaching dual sensory-impaired children where she will be provided, at a minimum, with all of the services outlined in her 2012–2013 IEP as well as the following compensatory educational services at USDB expense:

(1) Provide M.S. with a total communication approach that requires instructors to simultaneously voice, use tactile signs, and use gestures as well as a voice output device and object choice board.  These approaches are to be used consistently and repeatedly in an environment that allows for significant one-on-one instruction.  All people involved with M.S. should strive to use clear, consistent, and accurately formed signs paired with clear spoken language and meaningful object cues.

---

*Northport Pub. Sch.*, 487 F. App'x 968, 978 (6th Cir. 2012) (upholding a 768-hour compensatory-education award because the student's "window of opportunity to become usefully literate ha[d] begun to close").

[239] *See* Docket No. 24, at 1159, 1195, 1922, 2899.

[240] An academic year typically includes forty weeks of instruction.  M.S. therefore is eligible for sixty weeks of compensatory services.

(2) Provide M.S. sixty minutes per week of direct services from a speech language pathologist, who is proficient in tactile sign language. In addition, provide M.S. sixty minutes of consult speech language pathology services per month.

(3) Provide M.S. with tactile desensitization training with the goal of allowing M.S. to receive hearing aids as soon as possible. The training should occur until M.S.'s tactile defensiveness allows M.S. to receive hearing aids. The school where M.S. attends will be encouraged to utilize an FM system and take data on its efficacy so that M.S. can benefit from amplification while the tactile desensitization training is occurring.

And (4) Provide a combined total of sixty minutes per month of training for residential staff and M.S.'s family in the educational and behavioral methods the school employs with M.S. so that all services providers, residential staff, and M.S.'s family can strive to utilize the same methods.

## V. CONCLUSION

Based on the foregoing, it is hereby

ORDERED that USDB's Motion for Judgment on the Administrative Record (Docket No. 26) is DENIED. It is further

ORDERED that M.S.'s Motion for Judgment on the Administrative Record (Docket No. 25) is GRANTED IN PART AND DENIED IN PART. It is further

ORDERED that M.S.'s IEP team is directed to meet within thirty (30) days of this Order to establish an updated IEP for M.S that is consistent with this Order.

The Clerk of Court is hereby directed to close this case forthwith.

DATED this 25th day of August, 2014.

BY THE COURT:

_____
Ted Stewart
United States District Judge